**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MIRANDA CHRISTINE FRANCO,

      Plaintiff,

v.                                           CV 12-0819 WPL

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

Miranda Christine Franco filed applications for Disability Insurance Benefits and Supplemental Security Income on November 14, 2008. (Administrative Record ("AR") 13.) She alleges disability beginning on September 17, 2008, due to a seizure disorder, poor balance, leg and foot pain, a learning disability, memory loss, bladder problems, depression, and mood swings. (AR 41, 125, 127, 174.) Administrative Law Judge ("ALJ") Barbara Licha Perkins held a disability hearing on April 30, 2010. (AR 30-69.) On April 11, 2011, she determined that Franco was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 13-24.) Franco filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 5-7.)

Franco sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing (Doc. 22). Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties consented to have me serve as the presiding judge and enter a final judgment. Having carefully considered

the pleadings, facts, and relevant law, I grant Franco's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). A "decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the ALJ. *See id.* The ALJ's "failure to apply the correct legal standards, or to show us that she has done so, [is] also grounds for reversal." *Winfry v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (citing *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to the those in the Listing of Impairments, then, before reaching step four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ compares the claimant's RFC with the functional

requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

## FACTUAL BACKGROUND

Franco is a forty-five year-old woman who did not complete the tenth grade. (AR 33, 40.) While in school, she was in a special education program, and as an adult, she has tried to obtain her GED twice without success. (AR 40.) Franco has worked as a caregiver for individuals with disabilities, a dancer, a waitress, a retail saleswoman, a cashier, and a cafeteria server. (AR 34-37.) She currently serves as the primary caregiver for her school-aged granddaughter. (AR 213, 232.) Franco received disability benefits from the SSA for eleven years, but the SSA terminated her benefits in 1999. (AR 21.) After her benefits ceased, she worked until September 2008, when she claims she had to stop working because of her medical problems. (AR 174.)

Franco has a long history of illness. Beginning at the age of thirteen, she was diagnosed with epilepsy. (AR 42.) Franco's primary care physician, B.J. Davis, M.D., has treated her seizures since 1991 or 1992. (AR 177, 228, 249.) On her seizure history report from April 2009, Franco stated that she had grand and petit mal seizures and that the petite mal seizures occurred

3

two to three times a week. (AR 228.) A year later at the disability hearing, she reported that she only had petite mal seizures once every three weeks to a month and that she had not experienced a grand mal seizure for some time. (AR 43.)

In April 2009, Dr. Davis referred Franco to David McCraney, M.D., for a neurological consult. (AR 358.) Franco told Dr. McCraney that she suffered from both grand and petit mal seizures, but mostly the latter. (*Id*.) She claimed that she had seizures once a week and that she also suffered from a poor memory and frontal headaches. (*Id*.) Dr. McCraney's neurological examination of Franco revealed nothing unusual; she was alert and oriented, her speech was normal, her cranial nerves II-XII were "unremarkable," she had a normal gait, and her motor and sensory examinations were also normal. (AR 359.) He thought it unusual that Franco seemed more concerned about her headaches than her seizures. (*Id*.) He also believed Franco had a tendency toward somatization and that her complaint of memory loss "in particular is a neurotic complaint." (*Id*.) Dr. McCraney ordered an MRI of the brain and an EEG; the EEG found no epileptiform activity and was normal. (AR 361.) There is no MRI of the brain in the record.

As her primary care physician, Dr. Davis also treated Franco for her other medical conditions, including anxiety, depression, gastritis, reflux, headaches, and obesity. (AR 20.) He provided her prescription medication for her seizures as well as for her anxiety, depression, and gastritis, but he only recommended over-the-counter medication for her headaches. (AR 20, 178, 223, 249.) In January 2009, Franco requested she be tested for lupus and arthritis because of her pain, but the test results were all normal. (AR 338, 340-41.)

Franco also reported that she suffered from bladder problems and incontinence. In April 2008, Franco sought treatment from Alana Williams, M.D., and Shamarie Sais, M.D., at the Women's Specialists of New Mexico, Ltd. (AR 293.) On September 17, 2008, Dr. Williams

4

performed a transvaginal hysterectomy ("TVH"), anterior repair, and a transvaginal tape ("TVT") procedure on Franco. (AR 20, 284.) In a post-operative examination on October 27, 2008, Franco reported to Dr. Williams that she had urge incontinence and pelvic pressure and had experienced two leaks. (AR 280.) Franco requested four more weeks of disability, which Dr. Williams provided. (*Id*.) On November 24, 2008, Franco contacted Dr. Williams' office for an extension of her disability (AR 298) and scheduled an appointment on December 16, 2008, to discuss this option (AR 279). At the appointment, Dr. Williams told Franco that she could not ethically extend her disability since her surgery went well and they were working to treat the incontinence. (AR 279.)

On March 11, 2009, Franco underwent bladder testing, and Dr. Sais recommended pelvic floor physical therapy for her pelvic floor spasticity. (AR 350.) The record does not indicate whether Franco underwent physical therapy, but it does indicate that Franco was scheduled for a surgical procedure in June 2010 with Drs. Warzel and Schomer. (AR 392, 397.) However, there are no records of the surgery or any post-operative care.

In 2009, Franco went to Michael Cohn, D.P.M., for treatment for a fungal infection in her toes. (AR 389.) According to the notes, she had seen Dr. Cohn years before, and she reported to Dr. Cohn that he had diagnosed her with heel spurs; the medical record does not include this diagnosis. (*Id*.) Dr. Cohn treated the fungal toenail in September and October of 2009. In November 13, 2009, Franco saw Dr. Cohn for right heel pain. (AR 380.) Dr. Cohn performed multiple cortisone injections, but Franco still complained of pain. (AR 407.) Dr. Cohn ordered an MRI of her left foot (AR 406), and the MRI revealed no masses, a mild increase in fluid, but no significant underlying abnormality (AR 405). After reviewing the MRI in May 2010, Dr. Cohn

could not diagnose her with a specific ailment, so he suggested that Franco obtain another medical opinion. (AR 407.)

After Franco filed her applications for benefits, the SSA arranged for several consultative mental and physical examinations throughout 2009. On January 22, 2009, Barabara A. May-Valencia, Ph.D., performed a mental evaluation of Franco, including extensive IQ testing that showed Franco has a Verbal IQ of seventy-eight, a Performance IQ of seventy, and a Full Scale IQ of seventy-two. (AR 269-277.) She noted that Franco had never been hospitalized for psychiatric reasons and had seen a psychiatrist years ago but did not know the final diagnosis, if any. (AR 69.) Dr. May-Valencia observed that Franco was fully oriented, had normal motor activity, was cooperative and pleasant, had good long-term memory, poor short-term memory, and poor concentration. (AR 270.) Franco appeared to be in the borderline range of intellectual functioning, but Dr. May-Valencia did not diagnose her with borderline intellectual functioning or mental retardation. (AR 270-71.) Her final diagnostic impression was that Franco suffered from an unspecified depressive disorder and an unspecified learning disorder. (AR 270.)

Julian Lev, Ph.D., also performed a mental evaluation for the SSA. (AR 363.) Dr. Lev asked her about her daily life, and Franco told him she was independent in her self-care, cooked and cleaned a little, had one or two friends, and got along with people. (AR 364.) When asked if she could complete tasks properly and on time, Franco told Dr. Lev that she "would try." (*Id.*) Dr. Lev also estimated that Franco's intelligence was in the borderline range, but like Dr. May-Valencia, he made no diagnoses regarding her intellectual functioning and only diagnosed her with an unspecified depressive disorder. (AR 366.) He also commented that her attention and concentration were impaired based on a test involving a series of calculations, but he did not believe that Franco was concentrating while doing this task. (*Id.*) In his final concluding

6

statements, Dr. Lev stated he would need more information to determine whether her depression would affect her ability to work. (AR 367.) He also opined that her primary reason for her inability to maintain employment was her pain, not her mental impairments. (*Id.*) With respect to Franco's RFC, Dr. Lev believed that she would be able to understand and remember instructions but that her physical complaints may interfere with this ability. (*Id.*) He also thought her capable of interacting with coworkers, supervisors, and the public, adapting to changes in the workplace, and being aware of and reacting appropriately to normal hazards. (*Id.*)

Dan M. Cox[1] also submitted a consultative evaluation, opining that Franco had mild to moderate functional limitations. (AR 321.) Cox performed a general psychiatric review technique in addition to a more detailed evaluation of the Listing of Impairments' criteria for affective disorders and mental retardation. (AR 309-25.) He opined that Franco would be able to understand, remember, and carry out simple instructions and perform routine and repetitive tasks. (AR 325.) However, he did not believe that she should interact with the public or have more than superficial interaction with coworkers and supervisors. (*Id.*) He believed that she could perform at least unskilled work. (*Id.*)

Amy Kogut, M.D., performed a physical consultative examination in May 2009. (AR 354-57.) She needed more information before she could give an opinion as to the limitations caused by Franco's of her seizures. (AR 356.) However, Dr. Kogut did not notice any balance problems, limitations in the function in Franco's legs, limitations due to a learning disability or memory loss, nor did she find there were limitations from bladder problems. (*Id.*) She did believe there would be a limitation due to depression, but she did not know to what extent. (*Id.*)

---

[1] Cox's evaluation does not indicate if he is a physician or if he holds any form of advanced degree. (AR 309-25.)

Mark A. Werner, M.D., reviewed the record and provided a physical RFC evaluation. (AR 327-34.) Dr. Werner concluded that Franco could lift up to fifty pounds occasionally and twenty-five pounds frequently, had no limitations pushing and pulling, and could sit, stand or walk with normal breaks for six hours in an eight-hour workday. (AR 328.) Dr. Werner based his opinions on Dr. Davis' medical records as well as Franco's reported activities of daily living. (AR 328-29.) He found no postural limitations, aside from opining she should never climb scaffolds, ladders, or ropes. (AR 329.) His evaluation did not contain any manipulative, visual, or communicative limitations (AR 330-31), and the only environmental limitation was to avoid extreme hazards (AR 331).

## HEARING TESTIMONY

The ALJ held a hearing on April 30, 2010, at which Franco and Vocational Expert ("VE") Diane Weber testified. (AR 30.) Franco was represented by counsel at the hearing. (AR 32.) Franco described her work history and proceeded to discuss her impairments. (AR 34-39.) She testified that the primary problem that keeps her from working is the pain she experienced throughout the bottoms of both feet. (AR 40-41.) She informed the ALJ that she received shots to alleviate the pain, but they provided only some relief. (AR 41.)

Franco also testified that she had suffered from seizures since she was young and that she takes medications that partially control her seizures. (AR 42-43.) She stated that she has seizures in her sleep and that about once every three weeks to a month she will experience petit mal seizures during the day. (AR 43.) During the petit mal seizures she experiences dizziness, nervousness, and a rapid heartbeat, and she typically feels confused afterward. (*Id.*) She had not experienced a grand mal seizure during the day for "a while." (AR 44.)

Franco also discussed her incontinence and explained that she had undergone surgery for the condition and was scheduled for additional surgery. (AR 44-45.) She does not have accidents, but she does need to go to the bathroom very frequently. (AR 46.) She also testified that she had gained weight due to a thyroid condition (AR 49), takes medication for depression and anxiety (AR 50), uses over-the-counter medications to treat her headaches (AR 51-52), and takes prescription medication for heartburn (AR 57).

The ALJ then questioned Franco about her balance problems. (AR 52.) Franco explained that she has poor balance and has to catch herself from falling. (*Id*.) She experiences these problems about every other day, and she has suffered from this affliction for several years. (AR 52-53.)

Franco also testified that her back affects her ability to sit for more than twenty minutes, and then she needs to stand up and stretch. (AR 53-54.) Once standing, she is only able to stay up for five to ten minutes because she gets tired easily. (AR 54-55.) Her legs go numb when she is sitting or standing. (AR 55.) She claimed that due to her legs, bladder, and feet, she can only walk about a block. (AR 55-56.) When asked how much she could lift, Franco responded less than ten pounds. (AR 56.)

The VE testified at the conclusion of the hearing. (AR 57.) The ALJ asked the VE to assume a person of the same age, education, and work history as Franco, who has the following limitations: lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk with normal breaks for six hours in an eight-hour workday; sit for six hours with normal breaks in an eight-hour workday; push and pull in a manner consistent with the lifting and carrying limitations; climb ramps and stairs frequently but should never climb ropes ladders or scaffolds; balance and crouch occasionally; frequently stoop, kneel and crawl; has no manipulative or

visual limitations; should avoid even moderate exposure to hazardous moving machinery and unprotected heights; understand, remember, and carry out simple instructions and tasks that are repetitive in work that do not require interaction with the public; and should only have superficial interaction with co-workers and supervisors. (AR 59-60.) The ALJ then asked if the hypothetical person could perform jobs available in the regional or national economy. (AR 60.) The VE testified that the individual could perform the following jobs: laundry sorter, which has 467,010 jobs available in the national economy and 1,110 in New Mexico; a garment bagger, which has 777,630 jobs in the national economy and 2,150 in New Mexico; a silver wrapper, which has 509,550 jobs in the national economy and 4,100 in New Mexico; or a mail room sorter, which has 137,350 jobs in the national economy and 600 in New Mexico. (AR 60-62.)

The ALJ then asked the VE to change the hypothetical slightly such that the person could not stand or walk for more than two hours during the day and no more than thirty minutes continuously. (AR 62.) The VE stated the individual could also perform the jobs of an addresser, which has 139,420 jobs in the national economy and 470 jobs in New Mexico, a final assembler, which has 280,160 in the national economy and 380 jobs in New Mexico, or a table worker, which has 467,010 jobs in the national economy and 1,110 in New Mexico. (AR 62-63.)

Franco's attorney then questioned the VE and asked whether the urinary problems described would impact an individual's ability to perform any of the jobs. (AR 64.) The VE responded that an employer would not tolerate an employee who had to regularly "leave at a second's notice." (*Id*.) The attorney next asked that if the individual could only stand continuously for ten minutes, but still needed the option of sitting or standing every thirty minutes, whether that would impact the sedentary jobs listed. (AR 65.) The VE testified that that would eliminate all positions. (AR 66.)

## THE ALJ DECISION

The ALJ reviewed Franco's applications for benefits according to the sequential evaluation process. At the first step, the ALJ found that Franco had not engaged in substantial gainful activity since her alleged onset date of September 17, 2008. (AR 15.) Then, at the second step, the ALJ concluded that she suffers from the severe impairments of a mood disorder (a depressive disorder not otherwise specified), borderline intellectual functioning, anxiety, seizure disorder, stage II anterior prolapse of the bladder, status post-TVH and TVT-procedure for bladder problems, herpes simplex virus I and II, urge incontinence, gastritis, obesity, and headaches. (AR 15.) At step three, the ALJ found that Franco's combination of severe impairments did not equal one of the listed impairments. (AR 16.) The ALJ expressly considered paragraphs 12.04 and 12.05 in the Listing of Impairments, but she held that Franco met the requirements of neither. (AR 16-17.)

The ALJ then reviewed the medical evidence and determined that Franco had the RFC to perform light work, subject to the following limitations: lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk with normal breaks for six hours in an eight-hour workday; sit for six hours with normal breaks in an eight-hour workday; push and pull in a manner consistent with the lifting and carrying weight limitations; climb ramps and stairs frequently but should never climb ropes, ladders, or scaffolds; balance and crouch occasionally; frequently stoop, kneel and crawl; avoid exposure to hazardous moving machinery and unprotected heights; understand, remember, and carry out simple instructions and tasks that are repetitive in work that does not require interaction with the public; and engage in only superficial interaction with co-workers and supervisors. (AR 18.)

At step four, the ALJ concluded that Franco could not perform her past relevant work. (AR 23.) She considered Franco's age, education, work experience, and RFC for light work at step five and concluded that, based on the testimony of the VE, Franco could perform the work of a laundry sorter, garment bagger, silver wrapper, or sorter. (AR 23-24.) Accordingly, the ALJ concluded that Franco was not eligible for benefits. (AR 24.)

DISCUSSION

Franco challenges the ALJ's decision on four grounds. First, she argues that her cognitive impairments meet the requirements of paragraph 12.05 of the Listing of Impairments for mental retardation making her per se disabled. Second, Franco asserts that the RFC determination did not properly consider her mental impairments, pain, and physical limitations. Third, she claims that the ALJ's credibility determination is erroneous, and fourth, she contends that the jobs recommended by the VE do not meet her mental and physical limitations.[2] Since I find that Franco's second argument has merit, I will not discuss her third and fourth arguments.

**I.      Listing Requirements for Paragraph 12.05**

At step three, the ALJ considers whether the claimant has any impairment or combinations of impairments that would meet or exceed one of the medically listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The purpose of the Listing of Impairments in Appendix 1 is to describe "for each of the major body systems impairments that [the SSA considers] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). If a claimant's condition satisfies the criteria of a listed impairment, then the claimant is per se disabled. *Lax*, 489 F.3d at 1085. "For a

---

[2] This argument was not raised as a separate basis for remand; instead Franco included it in her challenge to the RFC determination. I have separated it out as a fourth claim since it would be considered a separate error at step five.

claimant to show that his impairment matches a listing, it must meet *all* of the specified medical

criteria. An impairment that manifests only some of those criteria, no matter how severely, does

not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

Paragraph 12.05 sets out the criteria for mental retardation. *See* 20 C.F.R. Pt. 404, Subpt.

P., App'x 1, 12.05. The listing begins with the following requirement:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*Id.* This initial requirement is known as a "capsule definition." *See Lax*, 489 F.3d at 1085.

Notably, the capsule definition is almost a verbatim recitation of the definition of mental

retardation from the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders

("DSM-IV"). *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed.

2000).

In addition to meeting the capsule definition, the claimant must also meet the criteria in

either paragraphs A, B, C, or D in order to meet the listing requirements for a legal disability. *See*

*Lax*, 489 F.3d at 1085. The listing defines A, B, C, and D as follows:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR
> B. A valid verbal, performance, or full scale IQ of 59 or less; OR
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>    1. Marked restriction of activities of daily living; or
>    2. Marked difficulties in maintaining social functioning; or
>    3. Marked difficulties in maintaining concentration, persistence, or pace; or

        4.  Repeated episodes of decompensating, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P., App'x 1, 12.05.

At step two, the ALJ considered whether Franco met the listing requirements for mental retardation by analyzing whether she met the requirements under "12.05C" and the criteria under "paragraph 'D.'"[3] (AR 16-18.) Admittedly, the use of 12.05C is confusing and gives the impression that the ALJ is evaluating the "C" criteria. This would explain why the focus of Franco's objection is whether she meets the "C" criteria. (Doc. 22 at 10-11.) However, a careful review of the ALJ's analysis of 12.05C reveals that the ALJ is evaluating the record as to whether Franco meets the capsule definition, not whether she meets the paragraph "C" criteria.[4] The ALJ found that Franco had never been diagnosed as having mental retardation and that her adaptive functioning level is not of a mentally retarded individual. (AR 16.) The ALJ's language parallels the capsule definition and, in turn, the definition of mental retardation as provided by the DSM-IV. Furthermore, the ALJ does not discuss the criteria in paragraph "C" by considering whether Franco has the requisite IQ between sixty and seventy in addition to an exacerbating mental or physical impairment

Having concluded that the ALJ was discussing the capsule definition, I turn now to the substance of the ALJ's decision. I believe that the ALJ supported her decision that Franco did not meet the capsule definition for mental retardation with objective medical findings. She supported her observations that Franco had never been diagnosed with mental retardation and

---

[3] The ALJ discusses paragraph "B" under 12.04, which she notes is the same as the paragraph "D" criteria under 12.05. (AR 16.)

[4] It is possible to argue that 12.05C must refer to the "C" criteria since the ALJ would not have needed to consider the "D" criteria at all if she had concluded that Franco did not meet the capsule definition. However, if the ALJ had been reviewing the "C" criteria and not the capsule definition, her subsequent analysis for the "D" criteria should have been styled 12.05D. For this reason and those listed in the body of this opinion, I believe the ALJ was discussing the capsule definition.

that her level of adaptive functioning is not consistent with that of a mentally retarded individual by discussing at length the findings of Dr. May-Valencia and Dr. Lev. (AR 16-17.) Specifically, the ALJ noted that Dr. May-Valencia found that Franco was in the borderline range of intellectual functioning, but did not diagnose her with borderline intellectual functioning, let alone with mental retardation. (AR 16, 269-71.) Likewise, Dr. Lev did not diagnose Franco with either mental retardation or borderline intellectual functioning, despite the fact that he had estimated that her intelligence was in the borderline range. (AR 17, 366.) The ALJ also considered the results of Franco's IQ testing, which places her squarely in the borderline intelligence range, not the range of mental retardation. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 740 (4th ed. 2000).

In her reply, Franco argues that Cox diagnosed her with mental retardation and the presence of this diagnosis is contrary to the ALJ's findings. (Doc. 25 at 1-2.) This statement is simply wrong. Cox never diagnosed her with mental retardation. He compiled a psychiatric review technique, and in it he concluded that she had a learning disorder and was not mentally retarded. (AR 313.)

Franco states that she meets the capsule definition and challenges the ALJ's decision in a haphazard way. Rather than argue that she meets the definition of mental retardation as defined by the SSA or the DSM-IV, Franco insists that the ALJ's conclusion that she had not been diagnosed with borderline intellectual functioning is inconsistent with the ALJ's step two finding that Franco has the severe impairment of borderline intellectual functioning. This argument confuses mental retardation and borderline intelligence, which are two separate diagnoses in the DSM-IV. Mental retardation is characterized by "significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two

of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 41-49. There are various ranges of mental retardation from mild to profound, which are marked by specific IQ ranges coupled with specific deficits in functioning. *Id.* Borderline intellectual functioning is a separate diagnosis and is associated with an IQ of 71-84. *Id.* at 740. The DSM-IV specifically notes that a differential diagnosis between mental retardation and borderline intellectual functioning may be complicated when there are other mental disorders, such as schizophrenia. *Id.*

Given that mental retardation and borderline intellectual functioning are separate disorders, the ALJ's determination that Franco has a severe impairment of borderline intellectual function does not undermine her decision that Franco did not meet the listing for mental retardation. Additionally, it appears as if the ALJ's observation that Franco had not been diagnosed with having borderline intelligence was a means to emphasize that the record did not support the conclusion that Franco suffers from mental retardation. It would be similar to stating, "she is not blind; in fact, she was not even diagnosed with a visual impairment," or "she is not deaf; in fact, she was not even diagnosed with hearing loss." The goal of the ALJ's statement was to underscore the dearth of objective medical evidence to support a finding that Franco had the requisite significantly subaverage intellectual functioning and deficits in adaptive functioning that constitute mental retardation for the purposes of finding legal disability.

Franco's argument regarding consistency has no bearing on the relevant legal question, which is whether the ALJ found that Franco met the capsule definition in 12.05. I find that the ALJ's decision at step three was consistent with her step two findings and is properly supported

16

by substantial evidence in the record. Furthermore, since the ALJ found that Franco did not meet the capsule definition, the ALJ's discussion of paragraph "D" criteria and Franco's arguments regarding paragraph "C" are of no import here. Thus, the ALJ's decision regarding the listing criteria is not a basis for remand.

## II.      The RFC Determination

The RFC is a measure of the maximum that a claimant can do physically and mentally on a regular and continuing basis. *See* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ is responsible for making a RFC determination at step four based on evidence of exertional and non-exertional impairments. *See* 20 C.F.R. §§ 404.1445(a)(4) ("[W]e will consider your ability to meet the physical, mental, sensory, and other requirements of work"), 416.945(a)(4) (same). To formulate the RFC, the ALJ assesses the claimant's restrictions on a function-by-function basis. SSR 96-8p, at *1, *3. The ALJ must consider all the evidence in the record when making the RFC determination, but the ALJ is not expected to discuss every piece of evidence. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

Franco attacks almost every aspect of the ALJ's RFC determination, beginning with the claim that the ALJ did not include all of the limitations from her mental impairment. Franco challenges whether the ALJ truly afforded great weight to the opinion of Cox as she claimed to have done (AR 22, 309-322, 362) by arguing that the RFC is contrary to Cox's opinion. Cox found that Franco had mild restrictions in activities of daily living and maintaining social functioning and that she has moderate limitations in maintaining concentration, persistence, or pace. (AR 319.) Cox also attached a more detailed assessment that found marked limitation in her ability to interact with the public (AR 324) and moderate limitations in her ability to get along with coworkers without distracting them or exhibiting behavioral extremes and to respond

appropriately to changes in the work setting (AR 323-24). His evaluation concluded that Franco would have difficulty working with the public or large groups of people but that she should be have to work with small groups of coworkers and supervisors on a superficial basis. (AR 325.)

Franco argues that the ALJ inexplicably failed to include Cox's finding that she has a moderate limitation in the ability to respond appropriately in changes in the work setting. I disagree, since it is clear that the ALJ relied heavily on Cox's summary conclusions in formulating the non-exertional component of the RFC. Cox believed that Franco should only engage in simple, repetitive work (AR 325); the ALJ likewise included the limitation that Franco should only do simple, repetitive tasks in the final RFC determination (AR 18). An ALJ's reliance on an examiner's use of the summary conclusions is appropriate. First, the courts cannot expect an ALJ to analyze and reference every element of a mental evaluation, especially when each evaluation is typically multiple pages in length, and there are generally several evaluations present in the record. *See generally Clifton*, 79 F.3d at 1009-10 (holding the ALJ must consider all of the evidence in the record, but nothing requires that he discuss every piece of evidence). Second, it is logical to assume that Cox, in making his summary remarks, took into account the findings he had previously made regarding Franco's ability to respond appropriately to changes in the work setting.

Franco complicates the discussion of the RFC determination with regards to her mental impairments by shifting focus from her ability to adapt to her ability to concentrate and persist. She asserts that the ALJ assumed that her concentration, persistence, and pace problems would be properly addressed by limiting the work to repetitive, simple tasks. Yet, the ALJ did not *assume* that that her limitations would be addressed by limiting her work to simple and repetitive tasks. Cox opined that despite Franco's limitations with respect to concentration, persistence, and

pace, Franco could perform such work. (AR 325.) The ALJ then adopted these findings almost verbatim when she crafted the RFC determination. (AR 18 ("the claimant can understand, remember, and carry out simple instructions and tasks that are routine and repetitive.").) Franco's claim that the ALJ failed to incorporate the findings of Cox into the final RFC assessment is patently incorrect since the RFC reflects all of Cox's ultimate conclusions.

Franco's next challenge to the RFC determination is that it does not properly reflect her pain and is therefore erroneous. However, on closer look, Franco's argument is not the ALJ improperly considered her pain, but that the ALJ erred when she gave Dr. Lev's opinion little weight because "he repeatedly states that he was basing his limitations, in part, on the claimant's statements regarding her physical complaints and resulting limitations, which are beyond the scope of his psychological evaluation." (AR 22.) While Franco is correct that the ALJ must consider the fact that a psychological disorder may combine with physical problems (Doc. 22 at 19 (citing *Winfry*, 92 F.3d at 1021)), this does not invalidate the ALJ's conclusion. The fact that the ALJ must consider the interaction between physical and psychological ailments has nothing to do with an ALJ's decision to afford an opinion little weight when it discusses matters outside the scope of the examiner's medical expertise. In fact, an ALJ is instructed to afford such opinions little weight, and the Code of Federal Regulations provides the following example of how an ALJ should consider such an opinion: "if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain." 20 C.F.R. § 416.927(c)(2)(ii). There is nothing improper about giving an opinion regarding physical symptoms little weight when it comes from a psychologist with a Ph.D. and no medical training. This is particularly true since the record contains the

opinions of physicians treating Franco for her physical ailments, and their opinions naturally deserve more consideration.

Franco's remaining arguments regarding the ALJ's consideration of her pain are conclusory and unpersuasive. She alleges that some of her physical impairments cause pain, including her bladder problems, gastritis, and headaches, but that the ALJ did not properly consider how this pain could impact her ability to stand or walk.

The SSA considers pain a symptom, and claimants seeking disability benefits on the basis of pain generally must present objective medical evidence of an underlying condition that confirms the severity of the allegedly disabling pain. *See* 20 C.F.R.§§ 404.1529, 416.929. Once a claimant establishes a medically determinable underlying condition, though, objective evidence of pain is not required to prove that the pain is severe enough to justify benefits. *Winfrey*, 92 F.3d at 1020 (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993)); *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir.1987). Allegations of pain naturally impact the outcome of the RFC determination, since the severity of the pain is a factor that the ALJ must consider. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945 (a)(3).

With respect to Franco's impairments of bladder problems and gastritis, the record contains diagnoses of these conditions, but it is completely devoid of any evidence to suggest that pain from either impacts her ability to stand or walk. While her treatment notes from Dr. Williams and Dr. Sais report that she complained of pelvic pain, her complaints were in regards to sexual activity (AR 279) or pressure that made her feel as if she needed to urinate (AR 280, 291, 350, 399, 398-99). So, although the record would support a finding that Franco has

impairments that would cause her pain, her motion to remand is the first and only indication that her impairments would produce pain that would limit her ability to stand or walk.[5]

As for Franco's headaches, the ALJ considered that there were no medical records to show that she had been diagnosed with any ailment relating to headaches, that she had ever been hospitalized or received emergency care for her headaches, or that she was on prescription medication for headaches. (AR 21.) Since there was no objective medical diagnosis to support Franco's allegations of disabling pain from headaches, the ALJ's determination that the pain was not as severe as she claimed is not legally erroneous.

Franco's final assault on the ALJ's RFC determination is that it failed to fully account for her foot problems and incontinence. As an initial matter, the RFC must only consider the impact of a claimant's severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(e), 416.945(e). However, the ALJ found that Franco did not have any impairments with regards to her feet at step two. (AR 15.) Franco has not challenged the validity of the ALJ's findings at this phase, but even if she had, I believe that the ALJ's decision is supported by substantial evidence in the record. The ALJ relied on Dr. Cohn's inability to diagnose her with any impairment after treating her for several months and the results of her MRI, which found no significant abnormalities. (*Id.*) Since the ALJ properly concluded that Franco did not have any impairments, severe or non-severe, with respect to her feet, the ALJ could not have committed a reversible error excluding a discussion of her foot pain from the RFC assessment.

Moving on to the matter of incontinence, I agree with Franco that the ALJ erred in her consideration of this impairment when formulating the RFC. (AR 20.) The ALJ first noted that

---

[5] During the hearing, Franco stated that her bladder problems contributed to her inability to walk more than one block. (AR 56.) However, her testimony does not state that it was pain from this impairment that limited her walking, and the context of the conversation suggests she was referring to the need to stay close to a restroom because of urge incontinence.

Franco was scheduled for surgery in June 2010, but no report of the procedure was submitted, so she assumed that the surgery was successful. Next, she considered the fact that Franco had only alleged that she had leaking problems, as opposed to complete incontinence, and held that Franco could use pads to remedy the problem.

The onus is typically on the ALJ to ensure that the record is developed, even when the claimant is represented by counsel. *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007). This duty requires that the ALJ contact a treating physician for additional evidence or clarification if the medical report does not contain all necessary information. *Robinson v. Barnhart,* 366 F.3d 1078, 1084 (10th Cir. 2004) (citing 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1))."The responsibility to see that this duty is fulfilled belongs entirely to the ALJ," so the fact that Franco was represented by counsel does not override this duty. *Id.* The duty to develop the record overlaps with the requirement that the ALJ base his decisions on substantial evidence. *Hamlin,* 365 F.3d at 1214 (citation omitted). Otherwise, the ALJ is impermissibly making a decision based on an absence of evidence. *Thompson*, 987 F.2d at 1491.

The ALJ admits that she was aware that Franco's bladder issues required a second surgery, and she knew that Dr. Warzel and Dr. Schomer had scheduled her for a second surgery in June 2010. (AR 392.) However, the ALJ made no effort to obtain the relevant medical records from Franco's physicians. Instead, the ALJ made an assumption about the outcome of the surgery and the remediation of Franco's condition based on the absence of additional records. This information is salient to a disability decision, since the VE testified at the hearing that an individual with Franco's RFC who needed to use the bathroom frequently and urgently would not be able to maintain employment. (AR 62.) Because the ALJ failed to fully develop the record

with respect to Franco's incontinence, her RFC determination was in part based on an absence of evidence. This constitutes legal error and is a basis for remand.

## CONCLUSION

Franco claims to have a number of medical ailments which render her eligible for benefits. While I believe that the ALJ has properly analyzed the impact of a bulk of Franco's physical and mental impairments on her ability to work, the ALJ failed to obtain all of the necessary medical records to determine the full effect of her incontinence. Accordingly, I grant Franco's motion (Doc. 22) and remand this case the SSA for proceedings consistent with this opinion.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.